**JASON H. LEE (not admitted in S.D.N.Y.)**
**DANIEL LOSS**
**RAHUL KOLHATKAR (not admitted in S.D.N.Y.)**
**NATASHA BRONN SCHRIER (not admitted in S.D.N.Y.)**
**CHRISTOPHER J. DUNNIGAN**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
44 Montgomery Street, Suite 700
San Francisco, CA 94104
Telephone: (212) 336-0061 (Dunnigan)
Email: dunnigancj@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**ALBERTO SANIGER MANTINAN, a/k/a ALBERT SANIGER,**<br><br>Defendant. | **COMPLAINT**<br><br>**25 Civ. 2937**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Alberto Saniger Mantinan, a/k/a Albert Saniger ("Saniger" or "Defendant"), alleges as follows:

## SUMMARY

1. From at least the spring of 2019 through December 2022 (the "Relevant Period"), Saniger, the founder and CEO of Nate, Inc. ("Nate") fraudulently solicited investments in Nate and raised over $42 million through the sale of Nate stock to multiple investors.

2. Saniger marketed Nate as a mobile shopping application ("app") that used artificial intelligence ("AI") to complete users' purchases across a variety of retail platforms. While soliciting investors, Saniger touted the app's purported reliance on AI, including machine learning and neural networks, to process transactions. But as Saniger knew or recklessly disregarded, the Nate app did not use AI to complete purchases.

1

3. During an initial seed round of fundraising ("the Seed Round"), between the spring of 2019 and April 2020, Saniger lied to investors about the Nate app's use of AI and the rate at which the app successfully completed users' purchases without human involvement. For example, Saniger told one investor that the app's automation rate was above 90% when in fact virtually all orders entered on the app at that time had to be placed manually, behind the scenes, by contract workers in the Philippines and elsewhere.

4. Saniger continued to deceive investors during a second round of fundraising for Nate in the spring of 2021 (the "Series A Round"). Saniger misrepresented to Series A investors that the Nate app functioned based on AI, including neural networks that "understand HTML and transact on websites in the same way consumers do." In fact, though, by the time the Series A Round closed in June 2021, few if any purchases on the app were completed without manual processing. And although Nate later deployed automated "bots" to process some orders on the app, these bots were less sophisticated than the AI that Saniger touted to investors.

5. During the Relevant Period, Nate also conducted product demonstrations for investors that made it falsely appear that the app was automatically completing purchases, when in fact, at Saniger's direction, Nate engineers and others worked behind the scenes to manually process the orders.

6. Saniger personally profited from his fraud, including by selling approximately $3 million of his own Nate shares to a Series A investor in June of 2021.

7. After a news report cast doubts on Nate's claimed use of AI in June 2022, Saniger failed to complete a Series B round, and the company ceased operations. Nate formally dissolved in January 2023, leaving investors with losses of substantially all their investments, totaling tens of millions of dollars.

## **VIOLATIONS**

8. By virtue of the foregoing conduct and as alleged further herein, Saniger violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11. The Commission seeks a final judgment: (a) permanently enjoining Saniger from violating the federal securities laws and rules that this Complaint alleges he has violated; (b) permanently enjoining Saniger from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Saniger from purchasing or selling securities for his own personal accounts; (c) ordering Saniger to pay disgorgement with prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (d) ordering Saniger to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (e) prohibiting Saniger from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13. Saniger, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant may be found in, is an inhabitant of, or transacted business in the Southern District of New York, and certain of the acts, transactions, practices, and courses of business alleged in this Complaint occurred within this District. For example, during the Relevant Period, Nate was headquartered, and offered and sold securities, in Manhattan and Saniger resided in Manhattan. Additionally, at least one Nate investor was located in Manhattan.

## DEFENDANT

15. **Saniger**, age 35, currently resides in Barcelona, Spain. He is the founder of Nate. During the Relevant Period, Saniger was Nate's CEO and controlled the company's operations.

## RELATED ENTITY

16. **Nate** was a Delaware corporation and had its principal place of business in New York, New York during the Relevant Period. Nate was dissolved in January of 2023.

## FACTS

### I. Background on Nate's Business

17. Saniger founded Nate in 2018 with the purpose of developing a mobile app that would use AI technology to expedite the checkout process for customers of online retailers.

18. Before launching the app to the general public in July 2020, Nate made its app available to certain users, including potential investors in the Seed Round.

19. From Nate's inception until its dissolution, Saniger controlled all aspects of the company's business and oversaw its engineering teams.

20. Throughout the Relevant Period, Saniger was in regular communication with the engineering teams and met with the engineering leads on a regular basis.

21.     In particular, Saniger received regular updates from Nate engineering leads about the status of the company's AI development and its functionality. At various times during the Relevant Period, the engineering leads informed Saniger that the company engineers had yet to develop working AI for the app.

22.     Saniger instructed the automation engineering groups that they were not to report on the status of AI development to other Nate employees.

23.     As a result, most Nate employees lacked visibility into the status of the company's AI technology.

24.     But as Saniger was aware, Nate depended, at all relevant times, on means other than AI, including manual data entry, to complete purchases that users made through the app.

**II.     Saniger Misleads Seed Investors about Nate's AI Capabilities**

25.     Saniger began soliciting investors for Nate's Seed Round in the spring of 2019.

26.     Saniger met with prospective investors, and he communicated with them by email and other means.

27.     While soliciting Seed Round investors, including two venture capital funds ("Investor A" and "Investor B"), Saniger made false and misleading representations concerning Nate's purported use of AI technology.

28.     For example, during meetings with employees of Investor A and separate meetings with employees of Investor B, Saniger said, in substance, that Nate used automated AI technology to complete purchases made through the app.

29.     Saniger told an employee of Investor A, in substance, that AI is what enabled the Nate app to function.

30.     Saniger also provided Investor A with written materials in the form of a "pitch deck" (the "Seed Round Pitch Deck") describing Nate as "a digital assistant able to transact online without human intervention" and as "the first non-human executive assistant that can buy anything, anywhere."

31.     Saniger approved the Seed Round Pitch Deck, controlled its content, and discussed it with employees of Investor A.

32.     Similar to Saniger's representations to Investor A, Saniger told Investor B, in substance, that Nate used neural networks to process user purchases and that the average processing time for an order was only 10 seconds.

33.     Saniger's representations to Investor A and Investor B, as discussed in paragraphs 27-30 and 32 above were false and misleading because, at the time of the Seed Round, the Nate app did not use AI to complete users' purchases, the company had not developed a functional AI model for the app, and purchases using the app required manual processing to be completed, which would have taken substantially longer than 10 seconds per transaction.

34.     Indeed, at the time of the Seed Round, orders placed on the Nate app were routed to human contractors, primarily located in the Philippines, who then needed to manually process the transactions.

35.     Prior to Investor A's Seed Round investment, Saniger arranged for an employee of Investor A to use the Nate app to make a purchase with an online retailer so that Investor A could experience how the app purportedly worked.

36.     The appearance of a successful purchase left the Investor A employee with the misimpression that the app worked as Saniger had represented.

37. As part of Investor A's diligence process, the same Investor A employee asked Saniger about Nate's "failure rate today in terms of when a human needs to get involved." On or about February 28, 2020, Saniger responded: "If you look at the automation piece only (and forget other things that could make things go wrong like credit card failure or out of stock etc) AND assuming we had a user base that fairly represents the entire world then success ranges from 93% to 97% . . . . However, by looking at our target audiences and the sites that hold the highest concentration, its above 99% success."

38. Saniger's response implied that most purchases on the Nate app did not require human involvement to be successfully completed.

39. Saniger's response was false and misleading because, as of February 2020, virtually all orders placed by Nate's users were manually completed, including by overseas contract workers.

40. Based on Saniger's communications with Nate's engineering teams, he knew or recklessly disregarded, that, contrary to his representations to Seed Round investors, the Nate app did not use AI to complete purchases on the app and instead required manual processing for all transactions.

41. On March 27, 2020, Investor B invested $4 million in Nate in return for shares of the company. Investor B transmitted this investment via wire transfer to a Nate bank account.

42. On April 2, 2020, Investor A invested $4 million in Nate in return for shares of the company. At Saniger's direction, Investor A transmitted this investment via wire transfer to a Nate bank account.

43. Saniger's representations regarding the Nate app's purported use of AI were important to Investor A's and Investor B's respective decisions to purchase Nate shares.

44. It also would have been important to a reasonable Seed Round investor to know that the AI technology Nate was attempting to build did not work to place orders within the Nate app, and that, at the time of the Seed Round, all orders on the app required manual input.

45. To date, Investor A and Investor B have not received back any of the money that they invested in Nate.

### III. Saniger Continues to Deceive Investors During Nate's Series A Round

46. Following the close of the Seed Round, Nate launched its app for the general public in July 2020.

47. Saniger solicited investments for Nate's Series A Round from approximately February 2021 to June 2021.

48. By that time period, Nate still had not developed working AI technology for its app.

49. Instead of using AI to complete users' purchases, Nate continued to process purchases manually, with the assistance of overseas contract labor.

50. By virtue of updates Saniger received from Nate's engineering teams, Saniger was aware that, at the time of the Series A Round, Nate still lacked a working AI model for the app and continued to rely on manual processing of transactions.

51. Nevertheless, Saniger falsely represented to prospective Series A investors that the app was using AI technology.

52. When soliciting Investor A and Investor B for the Series A Round, Saniger did not correct his prior misrepresentations concerning the Nate app's use of AI.

53. Additionally, Saniger had ultimate authority over the content of a pitch deck that Nate disseminated to prospective Series A investors (the "Series A Pitch Deck"), including Investor C and Investor D. The Series A Pitch Deck stated that the Nate app was enabled by "intelligent automation" and that Nate's "neural networks understand HTML and transact on websites in the same way consumers do."

8

54. Similarly, on or about May 19, 2021, Saniger held a meeting with representatives of Investor C, during which Saniger represented that the Nate app was powered by AI.

55. Based on communications with Saniger and materials provided by him, Series A investors, including Investor C and Investor D, understood that, at the time of the Series A Round, purchases on the app were automated.

56. Saniger's representations about AI and automation to Series A Round investors were false and misleading because, at the time of the Series A Round, most transactions on Nate's app required manual processing to be completed.

57. As a Nate automation employee confirmed for Saniger in a June 11, 2021 Slack message, Nate's "automation rate" was "essentially zero."

58. It was not until the fall of 2021, after the close of the Series A Round, that the Nate app began to complete a significant portion of transactions without manual processing, but, even then, the app relied on automated "bots," a much less advanced form of automation than the AI Saniger touted to investors.

59. For example, "bots" can only read (and complete transactions on) certain websites that they have been specifically trained on.

60. Saniger understood the limitations of "bots," as compared with AI, as reflected by his statement in the Seed Round Pitch Deck that "[b]ots crash every time the merchant adds a new product to the site, does A/B testing, or makes a permanent change to its design or order flow."

61. By virtue of updates Saniger received from Nate's engineering teams, Saniger knew or recklessly disregarded that, at the time of the Series A Round, Nate still lacked a working AI model for the app and relied instead on manual processing of transactions.

62. It would have been important to a reasonable Series A Round investor to know that the AI technology Nate was attempting to build did not work to place orders within the Nate application, and that, at the time of the Series A Round, manual processing was needed to complete most, if not all, orders placed on the app.

63. The specific representation in the Series A Pitch Deck that Nate's "neural networks understand HTML and transact on websites in the same way consumers do" would have been important to a reasonable investor as it would have guided their understanding of how advanced and scalable the relevant technology was.

64. Saniger's representations concerning the Nate app's use of AI were also important to a decision by Investor A to invest an additional $5.4 million in the Series A Round.

65. The Series A Round closed in June 2021. In total, Nate sold approximately $34 million of Nate shares to investors in the Series A Round, including, Investor A, Investor B, Investor C, and Investor D, among others.

66. Also in June 2021, Saniger sold $3 million of his own Nate stock to Investor D.

67. None of Investor A, Investor B, Investor C, or Investor D have received any money back on their Series A investments. In the aggregate, Series A investors lost tens of millions of dollars of losses.

## IV. Saniger Engaged in Additional Deceptive Conduct

68. Saniger also engaged in additional deceptive conduct to bolster the impression to investors that the Nate app functioned based on advanced AI technology.

69. During the Relevant Period, Saniger required Nate engineers to be on standby during product demonstrations to potential investors in order to ensure the successful completion of any test purchases and leave investors with a misimpression that the app worked as Saniger had represented.

70. Saniger also provided Nate engineers with the email addresses for a "VIP" list of potential investors so that any orders later placed by those investors could be promptly completed through the manual involvement of Nate workers.

71. This was similarly designed to give potential investors the false impression that the Nate app was functioning as claimed and autonomously completing the investors' online purchases.

**V.     Nate Collapses After Saniger's False AI Claims Come to Light**

72.     Following the close of the Series A Round, Saniger solicited additional investments in Nate and planned a Series B offering.

73.     However, in approximately June 2022, a news article published in "The Information" cast doubts on Nate's claimed use of AI.

74.     Following the article's publication, Nate was unable to complete the Series B offering.

75.     Nate ceased operations in January 2023, and Saniger terminated all of Nate's employees.

76.     In January 2023, Saniger dissolved Nate through a State of California Assignment for the Benefit of Creditors.

77.     Nate did not return funds to shareholders during its dissolution, thereby leaving investors with tens of millions of dollars in losses.

**VI.     Tolling Agreement**

78.     On February 11, 2025, Saniger, through counsel, signed a tolling agreement that suspended the running of the applicable statute of limitations from February 10, 2025 to February 24, 2025.

**FIRST CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

79.     The Commission re-alleges and incorporates by reference paragraphs 1 through 78.

80.     Saniger, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

81. By reason of the foregoing, Saniger, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 17(a) of the Securities Act)**

82. The Commission re-alleges and incorporates by reference paragraphs 1 through 78.

83. Sanger, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

84. By reason of the foregoing, Saniger, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

I.

Permanently enjoining Saniger from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

II.

Permanently enjoining Saniger from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Saniger from purchasing or selling securities for his own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

III.

Ordering Saniger to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78(d)(5) and 78u(d)(7)].

IV.

Ordering requiring Saniger to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Permanently prohibiting Saniger from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

VI.

Granting any other and further relief this Court may deem to be just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: April 9, 2025

Respectfully Submitted,

*/s/ Christopher J. Dunnigan*
JASON H. LEE*
DANIEL LOSS
RAHUL KOLHATKAR*
NATASHA BRONN SCHRIER*
CHRISTOPHER J. DUNNIGAN
*Attorneys for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION
(212) 336-0061 (Dunnigan)
dunnigancj@sec.gov

* Not admitted in S.D.N.Y.

14