UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALBERT SANIGER,<br><br>Defendant. | **INDICTMENT**<br><br>25 Cr. |

## COUNT ONE
### (Securities Fraud)

The Grand Jury charges:

### Overview

1.      From at least in or about 2019 through in or about December 2022, ALBERT SANIGER, the defendant, engaged in a scheme to defraud investors and prospective investors in his start-up Nate, Inc. by making materially false and misleading statements about the company's use of proprietary artificial intelligence ("AI") and its operational capabilities. SANIGER represented to investors that the company's shopping application, nate, used AI technology to intelligently and autonomously complete customers' merchandise orders across e-commerce websites. As part of the scheme, SANIGER induced the investment of over $40 million in investments in Nate, Inc.

2.      In reality, as ALBERT SANIGER, the defendant, well knew, nate was not powered by advanced AI technology that would differentiate it from other e-commerce businesses. Instead, the transactions processed through nate were, at times, manually completed by contractors in the Philippines and Romania and, at other times, completed by bots. Despite SANIGER's knowledge of the company's reliance on overseas workers, and its continued inability to successfully process transactions using AI, SANIGER continued to portray nate as fully automated and scalable.

SANIGER instructed employees to keep nate's reliance on overseas contractors a secret, and controlled the information shared with investors in order to prevent the discovery of his fraudulent misrepresentations. Ultimately, after SANIGER's fraud was exposed, the company failed and collapsed, leaving investors with near total losses.

**The Defendant Solicited Investments in Nate Based on Representations About AI**

3.    In or about 2018, ALBERT SANIGER, the defendant, founded Nate, Inc., an e-commerce company that launched the nate app. SANIGER marketed nate as a universal shopping cart app that simplified online shopping by enabling users to "skip the checkout" on retail websites by reducing the checkout process to a "single tap." For example, if a consumer found a pair of sneakers that they wanted to purchase on a particular e-commerce site, the user could buy the sneakers by opening nate and clicking "buy." Nate purported to take care of the remainder of the checkout process through AI: selecting the appropriate size, entering billing and shipping information, and confirming the purchase.

4.    Nate distinguished itself from other e-commerce companies and apps through a defining feature: the ability to intelligently and quickly complete retail transactions across all e-commerce sites through the use of AI technology. ALBERT SANIGER, the defendant, repeatedly told investors and the public that the company's app used proprietary AI technology to autonomously complete online purchases on behalf of users. For example, SANIGER and those working at his direction stated that nate could navigate retail websites, fill out checkout forms, and process payments with no human involvement—purportedly mimicking the actions of a human user in real time—through the use of "intelligent automation," "artificial intelligence," and technology that "understands web code and decides where to click and what to fill out, so [the

consumer does not] have to." These claims appeared on the company's website, in marketing materials, and in other statements by SANIGER.

5.    Based on representations about nate's use of AI, ALBERT SANIGER, the defendant, solicited investments from venture capital firms. In pitch materials transmitted to investors, SANIGER touted the company's use of AI and represented that nate was "able to transact online without human intervention." As prospective investors conducted due diligence, SANIGER repeatedly represented that—except for certain "edge cases" in which the AI failed to complete a customer transaction—the nate app was fully automated based on AI. For example, SANIGER told a Silicon Valley and Manhattan-based venture capital investment firm ("Investment Firm-1") that after a transaction occurs through the app, "a neural network … decide[s] what to do," and that "[e]very decision the network makes sends an instruction to a prediction tool that then implements the action on the website." SANIGER claimed that nate's "deep learning models" were "custom built" and use a "mix of long short-term memory, natural language processing, and reinforcement learning." SANIGER emphasized the speed with which nate's purported AI technology could execute transactions, telling Investment Firm-1 that nate could purchase goods directly on product pages in less than three seconds, and that the AI data models could support up to 10,000 transactions per day. When, on the eve of making an investment, an employee of Investment Firm-1 asked SANIGER about nate's automation rate, that is, the percentage of transactions successfully completed with nate's AI technology, SANIGER claimed that internal testing showed that "success ranges from 93% to 97%."

6.    Nate marketed its AI capability as a key differentiator in the e-commerce space and central to its scalability and profitability. ALBERT SANIGER, the defendant, distinguished between "dumb bots," used by competitors, and nate's artificial intelligence and neural networks,

which completed transactions as though they were done by a human. The distinction drawn by SANIGER between "bots" and AI reflected a broadly recognized difference in the two technologies. In the context of retail transactions, bots follow pre-programmed scripts for filling out a checkout form. Because each retail website requires a different bot script to operate, bots become costly to deploy over numerous websites and because any change to a retail website layout can break a bot's functionality and require intervention, those costs continue even after initial deployment. Further still, many e-commerce sites employ anti-bot detection, limiting their potential uses. To promote nate as a comparatively advantageous product, SANIGER specifically represented that nate did not use hard-coded bots built for each website, but instead performed transactions organically by "thinking" through each step of the checkout flow, adapting to different websites. For example, in an email to a prospective investor, SANIGER claimed that "nate is an intelligent machine" and that "it is not a bot, or a combo of bots."

7.    As ALBERT SANIGER, the defendant, knew, the company's representations to investors about its development and deployment of AI—and the related scalability and profitability of nate—was material to investors. In total, SANIGER raised more than $40 million from multiple investors.

**The Defendant Defrauded Investors Through a Series of Misrepresentations**

8.    While the use of AI to automate purchases on nate was always the goal, it was never the reality. Nate did not use AI to autonomously navigate the checkout process of e-commerce websites and complete purchases on behalf of users. While ALBERT SANIGER, the defendant, had acquired AI technology from a third party and hired a team of data scientists to develop it, nate's AI never achieved the ability to consistently complete e-commerce purchases. As SANIGER knew, at the time nate was claiming to use AI to automate online purchases, the app's

4

actual automation rate was effectively zero percent. Indeed, inside nate the company's most senior employees observed that "the cold, hard facts of the matter [were] that [the company's] automation rate remain[ed] stuck at 0%." Despite their best efforts, as they told SANIGER, the "automation rate [was] essentially 0 . . . ." SANIGER, however, concealed that reality from investors and most nate employees: he told employees to keep nate's automation rate secret; he restricted access to nate's "automation rate dashboard," which displayed automation metrics; and he provided false explanations for his secrecy, such as the automation data was a "trade secret."

9.     In truth, at the direction of ALBERT SANIGER, the defendant, nate relied heavily on teams of human workers—primarily located overseas—to manually process transactions, mimicking what users believed was being done by automation. SANIGER used hundreds of contractors, or "purchasing assistants," in a call center located in the Philippines to manually complete purchases occurring over nate. When a natural disaster occurred in the Philippines in October 2021, which created a backlog of customer purchases on nate, SANIGER directed a nate employee to set up a new call center in Romania to serve as a backup to the team in the Philippines. The workers in these call centers received notifications of customer purchase instructions and then manually placed the orders that investors had been told the app's AI would execute.

10.     Because ALBERT SANIGER, the defendant, understood that the disclosure of the manual teams would reveal his claims about nate to be false, he took steps to conceal the true nature of their work from investors. In some cases, SANIGER instructed nate employees not to discuss the manual teams with others, even other nate employees, and he caused contractors working on the manual teams to remove any reference to nate from their social media. Further, to prevent investors from becoming suspicious about the existence or quality of nate's technology, SANIGER directed that transactions through nate by investors and prospective investors be

5

prioritized by the contractors in the Philippines so that investors experienced the quickest, most reliable service that SANIGER's manual teams could provide.

11.    In or about the fall of 2021, with the busy holiday shopping season approaching and no prospect of developing and deploying successful AI technology, ALBERT SANIGER, the defendant, was concerned that the manual teams would not be able to keep up with customer demand. Despite numerous prior representations that nate did not use bots, SANIGER directed nate's automation team to develop "bots" to automate some transactions on nate. In so doing, SANIGER estimated that nate could mitigate high user demand by creating bots for nate's top 50 merchants. After creating the bots, nate used bots in addition to the manual teams to complete purchases that were purportedly being completed by AI technology. Despite his prior statements about bots, SANIGER did not disclose this development to investors.

### The Unwinding of nate

12.    On or about June 6, 2022, an exposé published by a trade journal reported that nate's technology was not powered by proprietary AI technology, but that nate employed low-cost human laborers in the Philippines to complete the checkout process. ALBERT SANIGER, the defendant, continued to lie after this public disclosure. In an attempt to lull his investors into not reporting the fraud or to maintain their investments, SANIGER falsely claimed that nate only relied on "humans-in-the-loop" for payments risk, data labeling, reinforcement learning training, and purchase completion for certain "edge cases." SANIGER did not disclose that nate had entirely relied on manual teams and bots to complete purchases on the nate app.

13.    Ultimately, ALBERT SANIGER, the defendant, never successfully developed or deployed functional AI on nate to automate customer purchases. In or about January 2023, nate

ran out of money, and the company was forced to sell its assets. Nate's investors were left with near total losses.

## STATUTORY ALLEGATIONS

14.     From at least in or about 2019 through in or about December 2022, in the Southern District of New York and elsewhere, ALBERT SANIGER, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, SANIGER made false and misleading statements to investors and prospective investors of Nate, Inc. about the operability and use of artificial intelligence in completing e-commerce transactions over Nate, Inc.'s nate app.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

15.     The allegations contained in paragraphs 1 through 13 of this Indictment are repeated and realleged as if fully set forth herein.

16.     From at least in or about 2019 through in or about December 2022, in the Southern District of New York and elsewhere, ALBERT SANIGER, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, SANIGER engaged in a scheme to obtain money from investors and prospective investors in Nate, Inc. by means of false and misleading statements about the operability and use of artificial intelligence technology in completing e-commerce transactions over nate, and in furtherance of that scheme used interstate wires, some of which transited to, from, or through the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATIONS

17.     As a result of committing one or more of the offenses charged in Counts One and Two of this Indictment, ALBERT SANIGER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money

in United States currency representing the amount of proceeds traceable to the commission of said offenses.

<u>Substitute Assets Provision</u>

18.    If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

_____
GRAND JURY FOREPERSON

_____
MATTHEW PODOLSKY
Acting United States Attorney